Internal Revenue Service
United States Department of the Treasury

# Coordinated Issue Paper - Distressed Asset/Debt Tax Shelters

**LMSB-04-0407-031**
**Effective Date: April 18, 2007**

**Coordinated Issue Paper**
**All Industries**
**Distressed Asset/Debt Tax Shelters**
**UIL: 9300.99-05**

## INTRODUCTION

This paper addresses the use of distressed assets (including creditors' interests in debt) to shift economic losses from a tax indifferent party to a U.S. taxpayer. A distressed asset/debt ("DAD") transaction typically involves the use of a limited liability company, taxed as a partnership, to shift losses among partners entering and exiting the partnership. A foreign party ("FP") owns a distressed asset with a substantial built-in loss. The foreign party contributes the high-basis, low-value asset to the partnership, which makes no election under I.R.C. Section 754 and thus keeps the high basis in the asset. The partnership typically, but not always, contributes the asset to another partnership. Then the foreign party transfers within a short period of time its interest in the upper-tier partnership to a U.S. taxpayer, who may be acting through a pass-through entity. The U.S. taxpayer contributes other property or money to the upper-tier partnership in order to create basis in the taxpayer's partnership interest. The lower-tier partnership sells (or exchanges) the high-basis, low-value asset to another entity related to the promoter, resulting in a significant tax loss that is allocated to the U.S. taxpayer/partner. Then the U.S. taxpayer claims the significant tax loss that has passed through the partnership to offset other income or gain. The effect is that the U.S. taxpayer is benefiting from the built-in economic losses in the foreign party's distressed asset when the U.S. taxpayer did not incur the economic costs of that asset. The U.S. taxpayer is also benefiting from claimed deductions for fees paid to the promoter for structuring the transaction.

This issue paper discusses the grounds for disallowing all or a portion of the losses U.S. taxpayers claimed as a result of investing in DAD transactions.

## ISSUES

1. Whether the partnership must substantiate the correct amount of the carryover/transferred basis of the contributed distressed assets.
2. Whether there was a contribution of property to the partnership by FP within the meaning of I.R.C. Section 721 so as to cause the partnership to take a carryover/transferred basis in such property pursuant to Section 723.
3. Whether the built-in loss on the disposition of the built-in loss assets should be disallowed or re-allocated under the anti-abuse rules contained in Treas. Reg. Section 1.701-2. 1
4. Whether, under judicial doctrines (i.e., step transaction, economic substance and substance over form) the built-in loss on the disposition (sale, exchange or write-down of the distressed assets) can be disallowed to the U.S. taxpayer.
5. Whether the built-in loss should be disallowed under Section 165(c)(2) because the partners and/or the partnership lacked the requisite profit motives.
6. Whether legal and promoter fees paid by the U.S. taxpayer with respect to a DAD transaction are generally deductible.
7. Whether the Section 6662 accuracy related penalty should be asserted against U.S. taxpayers who enter into DAD transaction.

**Footnote 1:** Under the typical facts of a DAD transaction, the built-in loss on the disposition of the distressed asset was properly allocated to the U.S taxpayer, as successor to the foreign party's partnership interest. Section 704 (c) requires a partnership to allocate gain or loss with respect to property contributed by a partner to the partnership so as to take into account the pre-contribution gain or loss. Under Treas. Reg. Section 1.704-3(a)(7), if a contributing partner transfers a partnership interest, built-in gain or loss must be allocated to the transferee partner as it would have been allocated to the transferor partner. Moreover, if the contributing partner transfers a portion of the partnership interest, the share of built-in gain or loss proportionate to the interest transferred must be allocated to the transferee partner. Thus, if the facts of a DAD transaction indicate that the built-in loss on the disposition of the distressed asset was not properly allocated to the U.S. taxpayer, an argument for re-allocating the loss may be available under Section 704(c). Such argument must be coordinated with the National office.

**CONCLUSIONS**

1. The partnership must provide adequate documentary proof to substantiate FP's adjusted basis in any of the contributed assets.
2. The contribution of a worthless asset to a partnership does not give rise to any carryover basis; a partnership has no adjusted basis in any asset that was worthless at the time it was contributed to the partnership.
3. If a partnership is formed or availed of in connection with a DAD transaction the principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service may recast that transaction, as appropriate, to achieve results that are consistent with the intent of subchapter K. This will result in disallowance of the built-in loss to the partnership.
4. Under judicial doctrines (i.e., step transaction, economic substance, and substance over form), the benefit of the built-in loss claimed upon the disposition of the distressed assets should be disallowed to the U.S taxpayer.
5. Any loss purportedly realized in connection with the investments should be disallowed to the partners and to the partnership under Section 165(c)(2) because the primary purpose of the investment was tax avoidance.
6. Legal and promoter fees and other "out-of-pocket expenses" paid by an individual U.S. taxpayer or a partnership with respect to a DAD transaction are generally not deductible.
7. The Service should assert the appropriate component(s) of the Section 6662 accuracy-related penalties against a U.S. taxpayer who claimed losses from a DAD transaction unless the taxpayer is able to establish reasonable cause and good faith under Section 6664(c)(1) and the applicable regulations.

**DESCRIPTION OF TRANSACTION**

In a DAD transaction, a foreign party ("FP") has a portfolio of assets 2 ("asset") in which the FP has a high basis (oftentimes FP's basis in any debt instrument is equal to the face amount) and the value of the asset is substantially less than the FP's basis, **i.e.**, an asset with a substantial built-in loss. The asset is then contributed under Section 721 to a newly formed domestic partnership ("P1") (usually an LLC treated as a partnership) in return for a 99% partnership interest. A promoter entity contributes a small amount of cash or other property to get a 1% interest and becomes the tax matters partner. The partnership takes a basis in the asset equal to the adjusted basis of the asset in the hands of the contributing partner pursuant to Section 723. Generally, the partnership's principal activity relates to briefly holding and disposing the distressed asset.

**Footnote 2:** Promotions identified thus far utilizing Distressed Assets or Debt as a loss generating device utilize, among other things, debt owed by customers of various Brazilian retailers and debt instruments of Russian, Korean, and Chinese entities. Other promotions involve the use of stock in subsidiaries of Asian conglomerates and portfolios of post-crash internet stocks. In some instances, the entity transferring the debt portfolio to the U.S. partnership (FP in the above discussion) is said to have originated the receivables during the ordinary course of its business activities. In other cases, the debt was acquired by a bank or asset management company from the originators of the receivables or through the extension of credit. Frequently, the debt is denominated in a foreign currency that has depreciated against the dollar between its origination and the date the debt was contributed to the partnership.

Within a few days of the date FP contributes the asset to P1, FP sells all or almost all of its partnership interest to a U.S. taxpayer for an amount equal to the fair market value of the asset. The sale of the partnership interest in P1 (always more than a 50% interest) by FP to the U.S. taxpayer causes a technical termination of the partnership year under Section 708(b)(1)(B). Because P1 has not made a Section 754 election, the adjustment to basis of partnership property provided by Section 743(b) does not apply. 3 Thus, the basis of the asset in the hands of the partnership does not change.

**Footnote 3:** For transfers after October 22, 2004, Sections 734(d) and 743(d) require basis adjustments for greater than $250,000 of built-in loss, irrespective of whether or not the partnership makes a Section 754 election. In addition, Section 833 of the AJCA, if applicable, would require a downward adjustment of P1's basis in the debt as a result of the sale.

Next, P1 contributes the distressed asset to a second partnership (LLC/partnership) ("P2") in return for a partnership interest. Under Section 723, P1 takes a basis in its partnership interest in P2 equal to its basis in the asset, and P2 takes a basis in the asset equal to P1's basis in such asset. Finally, P2 sells (or exchanges) the distressed asset to a promoter entity for its fair market value, realizing a loss on the transaction (the "built-in" loss) equal to the difference between P2's adjusted basis in the asset and the value of the asset (i.e., the amount received). Alternatively, P1 sells its new partnership interest in P2 to a promoter entity for its fair market value, realizing a loss on the transaction equal to the difference between P1's adjusted basis in P2 and the value of the asset (i.e., the amount received).

Generally, the loss realized by P2 on the sale of the asset (or by P1 on the sale of its interest in P2) is solely allocable to the U.S. taxpayer under the authority of Section 704(c) and Treas. Reg. Section 1.704-3(a)(7). The U.S. taxpayer may report its allocable share of the loss on its tax return, provided that the U.S. taxpayer's adjusted outside basis in the partnership interest in P1 is sufficient under the limitation of Section 704(d). In this regard, the U.S. taxpayer generally contributes a substantial amount of cash or other significant assets, such as a real investment portfolio, to P1 in order to generate the required outside basis for the loss to pass through. 4 Because the U.S. taxpayer's outside basis from the contribution is reduced when the built-in loss from the distressed asset passes through to the U.S. taxpayer, the U.S. taxpayer may later have gain upon, for example, the partnership's distribution of cash to the U.S. taxpayer or disposition of assets. Thus, DAD transactions may result in tax deferral rather than tax avoidance, although the U.S. taxpayer may also engage in an exit strategy with the partnership that inflates/increases the U.S taxpayer's outside basis again.

**Footnote 4:** Note that any liability contributed to the partnership in connection with a contribution of assets by an investor must be accounted for under Section 752 and the corresponding regulations. For instance, the contributing investor's outside basis must be adjusted accordingly for any deemed contributions or distributions. Sometimes an investor may purchase and sell economically offsetting option positions and contribute such positions to the partnership (or contribute the proceeds and obligation under a short sale to the partnership). For a DAD transaction involving such option positions, it must be determined whether each contribution of a written call option to the partnership after October 18, 1999, but before June 24, 2003, is an assumption of liability that reduces the basis in the partnership interest of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest.

Treas. Reg. §1.752-6(a). In addition, if options positions are contributed to the partnership in a DAD transaction, analyses under Sections 465 and 988 may be appropriate. Such analyses must be coordinated with the National office.

Treas. Reg. Section 1.752-6(a) provides that if, in a transaction described in Section 721(a), a partnership assumes a liability (defined in Section 358(h)(3)) of a partner (other than a liability to which Section 752(a) and (b) apply), then, after application of Section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of Treas. Reg. Section 1.752-6, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under Treas. Reg. Section 1.752-1 through Section 1.752-5. Section 358(h)(3) defines liability to include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes. Under Treas. Reg. Section 1.752-6(b)(1), the exceptions under Section 358(h)(2)(A) and (B) apply unless the transaction is substantially similar to Notice 2000-44 (Son of Boss). Thus, the reduction in a partner's basis is not required if the trade or business with which the liability is associated is transferred to the partnership assuming the liability as part of the transaction, or if substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

Because DAD transactions have been determined NOT to be substantially similar to Notice 2000-44 (Son of Boss), the exceptions under Sections 358(h)(2)(A)and(B) must be considered. While the Service believes it could successfully argue that no trade or business associated with the "liability" was transferred to the partnership, the taxpayer might argue that it qualified for the exception contained in Section 358(h)(2)(B) because substantially all of the assets associated with the sold position (i.e., the cash received for such position) generally are used to acquire the purchased position and such position generally is contributed to the partnership. Therefore, the Service believes that for a DAD transaction involving the contribution of offsetting option positions after October 18, 1999, but before June 24, 2003, Treas. Reg. Section 1.752-6 is applicable to the DAD transaction but will not result in a basis reduction below the adjusted value of the partner's interest in the partnership.

---

There are many variations on the above theme. Some of them are as follows:

1. FP contributes the distressed assets to P1, which contributes such assets to P2, which in turn contributes such assets to a third partnership ("P3"). The U.S. taxpayer purchases FP's interest in P1 and P1 sells its interest in P2 (or P2 sells its interest in P3) to a promoter entity.
2. FP contributes distressed assets to P1. FP then contributes its interest in P1 to P2 in

return for an interest in P2. The U.S. taxpayer then purchases FP's interest in P2. Then P1 sells the distressed assets to a promoter entity or accommodating party.

3. Same as (2) above except P1 "exchanges" the portfolio of distressed assets for a similar portfolio of distressed assets owned by another entity. This exchange is treated as a taxable transaction by the partnership.

**DISCUSSION**

**ISSUE 1. The partnership must provide adequate documentary proof to substantiate FP's adjusted basis in any of the contributed assets.**

The partnership has the burden of establishing its basis in the assets making up the portfolio or pool of distressed assets (**i.e.**, the measure of the partnership's carryover/transferred basis under Section 723), including establishing the contributing partners' bases in such assets at the time of contribution. **See Trigon Insurance Co. v. United States**, 215 F.Supp.2d 687 (E.D. Va. 2002) (holding that the taxpayer had not established the fair market value of insurance contracts and was not entitled to a deduction); **Estate of Andrews v. United States**, 850 F. Supp. 1279 (E.D. Va. 1994). Agents should issue IDRs requesting such basis information and, if it is not forthcoming, should issue Formal Document Requests under Section 982 requesting such "foreign based documentation."

**ISSUE 2. The contribution of a worthless asset to a partnership does not give rise to any carryover basis; a partnership has no adjusted basis in any asset that was worthless at the time it was contributed to the partnership.**

A contribution of a worthless asset to a partnership does not constitute a contribution of property within the meaning of Section 721 because nothing of value has been contributed. **Santa Monica Pictures, LLC, et al v. Commissioner**, T.C. Memo 2005-104 (5/11/05), Slip Opinion at 234, citing **Seaboard Commercial Corp. v. Commissioner**, 28 T.C. 1034, 1054 (1957). Since no property has been contributed to the partnership, the partnership has no carryover basis in the property under Section 723 and the partnership receives no basis in the asset as a result of the purported contribution.

Moreover, the basis in any asset contributed to a U.S. partnership by a foreign entity must be determined under U.S. tax principles. Section 166(a)(1) allows a deduction for any debt that becomes worthless within the taxable year. To give rise to a deduction under the statute, the debt must have value at the beginning of the year and become worthless during the year. A taxpayer may not claim a deduction for a debt that becomes worthless in a prior year. **Beaumont v. Comm'r**, 25 B.T.A. 474, 481 (1932). When a debt becomes wholly worthless, the owner's basis in the debt disappears. There is no basis in the tax law for resurrecting the basis of an asset which has become worthless in the past. Therefore, to the extent the contributed asset had become worthless in a prior tax period, the contributing partner would have no basis in such asset under U.S. tax principles.

The taxpayer might argue that the relevant asset was the entire portfolio or pool of distressed debts/assets and that such entire pool was not worthless despite the fact that many or most of the assets in such pool may have been worthless. Nothing in the Internal Revenue Code or the regulations attaches any special tax consequences to such a pool of assets. Each asset in the portfolio or pool must be looked at separately and if any asset is worthless, that asset is not property within the meaning of Section 721. And if such asset had become worthless in a prior period, the contributing foreign entity would have no basis in such asset. 5

---

**Footnote 5:** An argument regarding the worthlessness of distressed assets at the time the assets were contributed by the foreign party to the partnership (or the timing of a worthlessness deduction) requires much factual development and, therefore, is resource intensive. Any concerns about developing such an argument should be coordinated with the appropriate Technical Advisor.

**ISSUE 3. The Service may recast a DAD transaction involving a partnership formed or availed of to achieve results that are consistent with the intent of subchapter K. This will result in disallowance of the built-in loss to the partnership.**

Treas. Reg. Section 1.701-2(a), the partnership anti-abuse rule, provides that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

1. The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;
2. The form of each partnership transaction must be respected under substance over form principles; and
3. Except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income).

Treas. Reg. Section 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in Section 1.701-2(a). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K: (1) The purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) One or more of the purported partners of the partnership should not be treated as a partner; (3) The methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) The partnership's items of income, gain, loss, deduction, or credit should be reallocated; or (5) The claimed tax treatment should otherwise be adjusted or modified.

Treas. Reg. Section 1.701-2(c) provides that whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. The regulations, at Treas. Reg. Section 1.701-2(c), provide a nonexclusive list of factors that may indicate a disregard for the intent of Subchapter K:

1. The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;
2. The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;
3. One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or

loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;

4. Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;
5. Partnership items are allocated in compliance with the literal language of Sections 1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of Section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);
6. The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or
7. The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or a related party).

With regard to the above seven factors, as applied to the DAD cases, the following comments are noteworthy. First, if the U.S. taxpayer had purchased the distressed assets directly from FP rather than using P1 to temporarily hold such assets, there would have been no built-in loss to be recognized by the U.S. taxpayer. The built-in loss in the contributed assets would not have been shifted to the U.S. taxpayer. Second, if the contribution of the distressed assets by FP to P1 and the immediate sale of FP's interest in P1 to the U.S. taxpayer were integrated, such transaction would be a sale of such assets directly to the U.S taxpayer (and a contribution of such assets by the U.S. taxpayer to P1), which would have the same result as in the prior comment. Third, if FP contributed such assets to P1 for an interest in P1 and, pursuant to a pre-arranged plan, immediately sold the interest in P1 to the U.S. taxpayer, then FP had only a nominal fleeting interest in P1, had no real participation in the profits or activities of P1, and was, in effect, protected against further loss.

Treas. Reg. Section 1.701-2(d) provides Examples illustrating the principles in Treas. Reg. Section 1.701-2(a), (b), and (c). The Examples do not delineate the boundaries of either permissible or impermissible types of transactions. Further, the addition of any facts and circumstances that are not specifically set forth in an
Example (or the deletion of any fact or circumstance) may alter the outcome of the transaction described in the Example. Unless otherwise indicated, parties to the transactions (in the Examples) are not related to one another.

In Example 8 (Plan to duplicate losses through absence of Section 754 election; use of partnership not consistent with subchapter K), A owns land with a basis of $100x and a fair market value of $60x. A would like to sell the land to B. A and B devise a plan a principal purpose of which is to permit the duplication, for a substantial period of time, of the tax benefit of A's built-in loss in the land. To effect this plan, A, C (A's brother), and W (C's wife) form partnership PRS, to which A contributes the land, and C and W each contribute $30x. All partnership items are shared in proportion to the partners' respective contributions to PRS. PRS invests the cash in an investment asset (that is not a marketable security within the meaning of Section 731(c)). PRS also leases the land to B under a three-year lease pursuant to which B has the option to purchase the land from PRS upon the expiration of the lease for an amount equal to its fair market value at that time. All lease proceeds received are immediately distributed to the partners. In year 3, at a time when the values of the partnership's assets have not materially changed, PRS agrees with A to liquidate A's interest in exchange for the investment asset held by PRS. Under Section 732(b), A's basis in the asset distributed equals $100x, A's basis in A's partnership interest immediately before the distribution. Shortly thereafter, A sells the investment asset to X, an unrelated party, recognizing a $40x loss.

In the Example, PRS does not make an election under Section 754. Accordingly, PRS's basis in the land contributed by A remains $100x. At the end of year 3, pursuant to the lease option, PRS sells the land to B for $60x (its fair market value). Thus, PRS recognizes a $40x loss on the sale, which is allocated equally between C and W. C's and W's bases in their

partnership interests are reduced to $10x each pursuant to Section 705. Their respective interests are worth $30x each. Thus, upon liquidation of PRS (or their interests therein), each of C and W will recognize $20x of gain. However, PRS's continued existence defers recognition of that gain indefinitely. Thus, if this arrangement is respected, C and W duplicate for their benefit A's built-in loss in the land prior to its contribution to PRS.

On the facts in Example 8, any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes (see Treas. Reg. Section 1.701-2(c)). Accordingly, the transaction lacks a substantial business purpose (see Treas. Reg. Section 1.701-2(a)(1)). In addition, factors (1), (2), and (4) of Treas. Reg. Section 1.701-2(c) indicate that PRS was used with a principal purpose to reduce substantially the partners' tax liability in a manner inconsistent with the intent of subchapter K. On such facts, PRS is not bona fide (see Treas. Reg. Section 1.701-2 (a)(1)), and the transaction is not respected under the applicable substance over form principles (see Treas. Reg. Section 1.701-2(a)(2)). Further, the tax consequences to the partners do not properly reflect the partners' income; and Congress did not contemplate application of Section 754 to partnerships such as PRS, which was formed for a principal purpose of producing a double tax benefit from a single economic loss (see Treas. Reg. Section 1.701-2(a)(3)). Thus, PRS has been formed and availed of with a principal purpose of reducing substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under judicial principles or other statutory authorities, such as the substance over form doctrine or the disguised sale rules under Section 707 (see Treas. Reg. Section 1.701-2(h)), the Commissioner can recast the transaction as appropriate under Treas. Reg. Section 1.701-2(b). The anti-abuse rule under Treas. Reg. Section 1.701-2 should not be used to the exclusion of other judicial doctrines or statutory arguments, which must be fully developed factually.

A DAD investor may try to distinguish Example 8 from the DAD transactions, stating that there is no duplication of the loss, as in the example. However, FP's built-in economic loss in the DAD transaction is duplicated for the benefit of the U.S. taxpayer, who, like C and W in Example 8, experiences no economic loss.

In a DAD case, if FP had not transferred the asset to a domestic partnership but had merely sold the asset, FP would not have realized any tax loss recognizable in the U.S. The effect of transferring the asset to a domestic partnership, selling 100 percent of that partnership interest to a domestic taxpayer, and allowing the domestic partnership to realize the built-in loss has the direct, intended effect of reducing the domestic taxpayer's U.S. tax liability and the partners' aggregate federal tax liability without serving any business purpose.

In addition, the requirement that the tax consequences to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partner's income is not met. In a DAD transaction, a significant economic tax loss is shifted from a tax indifferent partner that acquired the asset at a certain value before the asset lost value to result in a substantial built-in loss to a U.S. taxpayer through a scheme to transfer basis in the contributed asset so the U.S. taxpayer could claim a loss for U.S. tax purposes. The economic loss that may be generated on the direct or indirect disposition of the asset by FP bears no relationship to the loss claimed by the U.S. taxpayer as a result of the manipulation of basis under Sections 754, 743, and 734. The only economic loss, if any, would be incurred by FP on the sale of the asset or on FP's sale of its partnership interest to the U.S. taxpayer.

Also in many DAD cases there may be little, if any, evidence that the partnership engaged in any business activities reasonably calculated to generate income. Instead, the partnership managed to dispose of the distressed asset within a month (or months) of the time it was originally transferred to the partnership and conducted few, if any, other activities. Any gain or loss from such activities is incidental to the transaction.

Based upon all the facts and circumstances in a DAD case, the Service may recast the transaction under Treas. Reg. Section 1.701-2 either to disregard the partnership (in cases where the partnership engages in no substantial activities with regard to the distressed assets and has no other substantial investment or business activities) or to disregard FP as a

partner. In this latter case, the distressed assets are treated as having been sold by FP to either the partnership or the U.S. taxpayer and such purchaser would acquire only a fair market value (**i.e.,** the amount paid) cost basis in such asset (**i.e.,** no built-in loss).

However, in a DAD transaction for which the taxpayer can objectively demonstrate that the structure of the transaction and the activities had economic substance, the transaction would not be recast under Treas. Reg. Section 1.701-2. Specifically, in a DAD transaction, the partnership anti-abuse rule under Treas. Reg. Section 1.701-2 should not be raised when taxpayers can demonstrate that the structure of the transaction and the activities of the partnership had practical economic effects other than the creation of income tax losses, or the shifting of losses from a tax indifferent party to a U.S taxpayer.

The application of the partnership anti-abuse rule under Treas. Reg. Section 1.701-2 may be appropriate in a typical DAD case. Accordingly, the National Office (Office of Chief Counsel) has authorized the application of the partnership anti-abuse rule under Treas. Reg. Section 1.701-2 to DAD cases involving transfers before October 23, 2004, 6 in addition to any other statutory or judicial arguments. Any questions regarding the appropriateness of applying Treas. Reg. Section 1.701-2 to a particular case may be directed to the National Office (Office of Chief Counsel). For DAD cases involving transfers after October 22, 2004, a determination regarding whether the facts of a specific case are appropriate for the application of Treas. Reg. Section 1.701-2 must be coordinated with the National Office pursuant to Announcement 94-87, 1994-27 I.R.B. 124.

---

**Footnote 6:** See supra footnote 3.

---

**ISSUE 4. Under judicial doctrines (i.e., step transaction, economic substance, and substance over form), the benefit of the built-in loss claimed upon the disposition of the distressed assets should be disallowed to the U.S. taxpayer.**

The primary purpose of the DAD transaction is not for the partnership to make a profit from the sale of and/or collection on the distressed assets. Rather, the transaction is engaged in for the purpose of manipulating tax rules to shift a built-in loss from a tax indifferent party to a U.S. taxpayer. Various judicial doctrines may be applicable to DAD transactions. The arguments have been classified under the general doctrines of step transaction, economic substance and substance over form. 7 However, even in those cases when it is appropriate to raise the argument, judicial doctrines should only be asserted as a secondary or tertiary argument, following any appropriate technical arguments.

---

**Footnote 7:** Note that some courts may categorize the doctrines in a different manner.

---

**A. Step Transaction Doctrine**

In tax avoidance situations such as DAD transactions, the substance of a transaction, rather than its form, governs the federal income tax treatment of the transaction. **Commissioner v. Court Holding Co.,** 324 U.S. 331 (1945); **Gregory v. Helvering,** 293 U.S. 465 (1935). The question of the applicability of the substance over form doctrine and related judicial doctrines requires "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." **Harris v. Commissioner**, 61 T.C. 770, 783 (1974). **See also, Gordon v. Commissioner**, 85 T.C. 309, 327 (1985); **Gaw v. Commissioner**, T.C. Memo. 1995-531, **aff'd without**

**published opinion**, 111 F.3d 962 (D.C. Cir. 1997). One such judicially created doctrine is the step transaction doctrine.

Under the step transaction doctrine, a series of formally separate steps may be collapsed and treated as a single transaction if the steps are in substance interrelated and focused toward a particular result.

> The step transaction doctrine generally applies in cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C. The whole purpose of the unnecessary steps is to achieve tax consequences differing from those which a direct path from A to D would have produced. In such a situation, courts are not bound by the twisted path taken by the taxpayer, and the intervening steps may be disregarded or rearranged. [Citation omitted.]

**Smith v. Commissioner**, 78 T.C. 350, 389 (1982). **See also Andantech v. Commissioner**, T.C. Memo. 2002-97, **aff'd in part and remanded in part**, 331 F.3d 972 (D.C. Cir. 2003); **Long Term Capital Holdings, et al. v. United States**, 330 F. Supp. 2d 122 (D. Conn. 2004). Courts have applied three alternative tests in deciding whether the step transaction doctrine should be invoked in a particular situation: the binding commitment test, the end result test, and the interdependence test.

The binding commitment test is the most limited of the three tests. It looks to whether, at the time the first step was entered into, there was a binding commitment to undertake the later transactions. This is the most rigorous test of the step transaction doctrine. **Commissioner v. Gordon**, 13 F.3d 577, 583 (2d Cir. 1994). If there were a moment in the series of the transactions during which the parties were not under a binding obligation, the steps cannot be collapsed under this test. As a practical matter, the binding commitment test is seldom used. **See, e.g., Andantech v. Commissioner, supra; Long Term Capital, supra**.

The end result test analyzes whether the formally separate steps merely constitute prearranged parts of a single transaction intended from the outset to reach a specific end result. This test relies on the parties' intent at the time the transaction is structured. The intent the courts focus on is not whether the taxpayers intended to avoid taxes, but whether the parties intended from the outset to "to reach a particular result by structuring a series of transactions in a certain way." Additionally, they focus on whether the intended result was actually achieved. **True v. United States**, 190 F.3d 1165, 1175 (10th Cir. 1999).

Finally, the interdependence test looks to whether the steps are so interdependent that the legal relations created by one step would have been fruitless without a completion of the later series of steps. **See Penrod v. Commissioner**, 88 T.C. 1415, 1428-1430 (1987). Steps are generally accorded independent significance if, standing alone, they were undertaken for valid and independent economic or business reasons. **Green v. United States**, 13 F.3d 577, 584 (2d Cir. 1994); **Sec. Insurance Company v. United States**, 702 F.2d 1234, 1246 - 7 (5 th Cir. 1983).

The existence of economic substance or a valid non-tax business purpose in a given transaction does not preclude the application of the step transaction doctrine.

> Events such as the actual payment of money, legal transfer of property, adjustment of company books, and execution of a contract all produce economic effects and accompany almost any business dealing. Thus, we do not rely on the occurrence of these events alone to determine whether the step transaction doctrine applies. Likewise, a taxpayer may proffer some nontax business purpose for engaging in a series of transactional steps to accomplish a result he could have achieved by more direct means, but that business purpose by itself does not preclude application of the step transaction doctrine. **True v. United States, supra**, at 1177. **See also Associated Wholesale Grocers v. United States**, 927 F.2d 1517 (1991); **Long Term Capital Holdings**, supra, at 193.

The three tests are not mutually exclusive and the requirements of more than one test may be met in one transaction. Further, the circumstances of a transaction need only satisfy one of the tests for the step transaction to operate. **Associated Wholesale Grocers, Inc. v. United States**, 927 F.2d 1517, 1527-1528 (10th Cir. 1991) (finding the end result test inappropriate but applying the step transaction doctrine using the interdependence test). And finally, even if the step transaction doctrine does not apply to an entire transaction, it may allow the Government to collapse a portion of a transaction, which may be sufficient to prevent the intended tax avoidance result. For a recent detailed discussion of the application of the three alternative tests in lease stripping transactions, **see Andantech L.L.C. v. Commissioner, supra,** and **Long Term Capital, supra**.

The step transaction doctrine is particularly tailored to the examination of transactions involving a series of potentially interrelated steps for which the taxpayer seeks independent tax treatment. **True v. United States**, 190 F.3d at 1177. As a general rule, courts have held that in order to collapse a transaction, the Government must have a logically plausible alternative explanation that accounts for all the results of the transaction. **Del Commercial Props. Inc. v. Commissioner**, 251 F.3d 210, 213-214 (D.C. Cir. 2001), **aff'g** T.C. Memo. 1999-411; **Penrod v. Commissioner, supra**, at 1428-1430; **Tracinda Corp. v. Commissioner**, 111 T.C. 315, 327 (1998). The explanation may combine steps; however, some courts have declined to apply the doctrine where the Government's alternative explanation would invent new steps or simply reorder the actual steps taken by the parties. "'Useful as the step transaction doctrine may be . . . it cannot generate events which never took place just so an additional tax liability might be asserted.'" **See Grove v. Commissioner**, 490 F.2d 241, 247-248 (2d Cir. 1973), **aff'g** T.C. Memo. 1972-98 (quoting **Sheppard v. United States**, 176 Ct. Cl. 244; 361 F.2d 972, 978 (1966))); **see also Esmark, Inc. & Affiliated Cos. v. Commissioner**, 90 T.C. 171, 196 (1988), **aff'd without published opinion**, 886 F.2d 1318 (7th Cir. 1989); **But cf. Long Term Capital, supra**, at 196 (footnote 94)(indicating that **Esmark** may be of limited applicability and distinguishable where all of the parties necessary to achieve the ultimate result are privy to the mutual understanding between the parties.)

The step transaction doctrine may be applicable to a typical DAD transaction, depending of course, on how the actual transaction is structured. For example, the end result test and/or the interdependence test of the step transaction doctrine could be used to disregard the contribution of the distressed assets by FP to the partnership and to treat such purported "contribution" as either: 1) a sale of such assets to the partnership (in exchange for the cash constructively contributed by the U.S. taxpayer) or 2) a sale of the assets to the U.S. taxpayer followed by a constructive contribution of such assets to the partnership. In either construction the assets would have a fair market value basis in the hands of the partnership, the substantial built-in loss would be an economic loss for FP, and the U.S. taxpayer would not be allocated a significant loss from the partnership. If it can be shown that FP's transitory ownership of an interest in P1 added nothing of substance to the transaction, then FP's transitory ownership of an interest in P1 may be disregarded.

Examiners should look at the facts (such as all agreements involving the promoter, FP, U.S. taxpayer, or partnership as well as the kind and extent of business activities conducted by the partnership) on a case-by-case basis to determine if the step transaction doctrine would be applicable in their specific case.

**B. Economic Substance**

Discretion must be exercised in determining whether to utilize an economic substance argument 8 in all cases. The doctrine of economic substance should be considered, but only in cases where the facts show that the transaction at issue was primarily designed to generate the tax losses, with little if any possibility for profit, and that such was the expectation of all the parties. Specifically, in a DAD transaction, the argument should not be raised when taxpayers can demonstrate that the structure of the transaction and the activities of the partnership had practical economic effects, **i.e.,** realistic profit potential, other than the creation of income tax losses, or the shifting of losses from a tax indifferent party to a U.S. taxpayer.

**Footnote 8:** This doctrine is also referred to by the courts as the "sham transaction" or "sham in substance" doctrine. For purposes of this document, the doctrine is referred to as the "economic substance" doctrine.

The wide variety of facts required to support its application should be developed at the Exam level. The sources for these facts will be similar: documents obtained from taxpayers, the promoter and other third parties; interviews with the same; and an analysis of financial data and industry practices. Examiners must not hesitate to issue summonses if IDRs or other less formal case development efforts are not effective.

**I. Background**

In order to be respected, a transaction must have economic substance separate and distinct from the economic benefit achieved solely by tax reduction. **See Frank Lyon Co. v. U.S.**, 435 U.S. 561, 583-84 (1977). A transaction has economic substance if it is rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and economic situation and the transaction has a reasonable possibility of profit. **See Rice's Toyota World v. Commissioner**, 752 F.2d 89 (4th Cir. 1993); **Pasternak v. Commissioner**, 990 F.2d 893 ( 6th Cir. 1993); **ACM Partnership v. Commissioner**, 157 F.3d 231 (3d Cir. 1998).

A transaction's economic substance is determined by analyzing the subjective intent of the taxpayer entering into the transaction and the objective economic substance of the transaction. The various United States Courts of Appeals differ on whether the economic substance analysis requires the application of a two-prong test or is a facts and circumstances analysis regarding whether the transaction had a "practical economic effect," taking into account both subjective and objective aspects of the transaction. **Compare Rice's Toyota World** and **Pasternak** at 898 (applying the two-pronged test) **with Sacks v. Commissioner**, 69 F.3d 982 (9th Cir. 1995)(applying the facts and circumstances analysis). 9 **See also Gilman v. Commissioner**, 933 F.2d 143, 148 (2d Cir. 1991)("The nature of the economic substance analysis is flexible…").

**Footnote 9:** In the Third Circuit, in determining "whether the taxpayer's transactions had sufficient economic substance to be respected for tax purposes", the analysis "turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind them." **ACM Partnership v. Commissioner**, 157 F.3d 231, 247 (3d Cir. 1998), **aff'g in part and rev'g in part** T.C. Memo. 1997-115, **cert. denied**, 526 U.S. 1017 ( 1999)(citing **Casebeer v. Commissioner**, 909 F.2d 1360, 1363 (9th Cir. 1990) [other citations omitted]. **See also In re: CM Holdings, Inc.**, 301 F.3d 96, 102 (3d Cir. 2002). However, this analysis does not require a rigid two-step analysis. **See id**. Similarly, in the Tenth Circuit, although the court recognized the two-prong test from **Rice's Toyota World**, the court held "The better approach, in our view, holds that 'the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses." **James v. Commissioner**, 899 F.2d 905, 908-9 (10th Cir. 1990)(citation omitted).

Moreover, among the United States Courts of Appeals that apply a two-prong test, there is disagreement as to whether the test is disjunctive or conjunctive. For example, the Fourth Circuit Court of Appeals applies the test disjunctively: a transaction will have economic substance if the taxpayer had either a nontax business purpose or the transaction had objective economic substance. **Rice's Toyota World** at 91-92. 10 However, the Sixth Circuit Court of Appeals and Eleventh Circuit Court of Appeals apply the test conjunctively: a

transaction will have economic substance only if the taxpayer had both a nontax business purpose and the transaction had objective economic substance. **See Pasternak** at 898 and **United Parcel Service of America v. Commissioner,** 254 F.3d 1014, 1018 (11th Cir. 2001) (citing **Kirchman v. Commissioner**, 862 F.2d 1486, 1492 (11th Cir. 1989)).

---

**Footnote 10:** The Eighth Circuit appears to apply the disjunctive test provided in **Rice's Toyota World,** but indicates that a rigid two-part test may not be required. **Shriver v. Commissioner,** 899 F.2d 724, 725-8 (8th Cir. 1990). The DC Circuit and Federal Circuit apply the disjunctive test. **See Horn v. Commissioner**, 968 F.2d 1229, 1236 (DC Cir. 1992); **Drobny v. U.S.**, 86 F.3d 1174 (Fed. Cir. 1996)(unpublished opinion). It is unclear whether the Second Circuit applies the test disjunctively or under a facts and circumstances analysis. Compare Gilman, supra, at 148 (citing **Jacobson v. Commissioner**, 915 F.2d 832, 837 (2d Cir. 1990)(additional citations omitted)) ("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect.") with **TIFD III-E Inc. v. U.S.**, 2004 WL 2471581, 12(D.Conn. Nov 01, 2004) ("The decisions in this circuit are not perfectly explicit on the subject. Recently, for example, Judge Arterton adopted the more flexible standard, but acknowledged some potentially contrary, or at least ambiguous, language in **Gilman. Long Term Capital Holdings v. United States**, 2004 WL 1924931, 39 n. 68 (D.Conn. Aug.27, 2004). That ambiguity, however, does not affect the decision of this case. As I will explain, under either reading I would conclude that the Castle Harbour transaction was not a 'sham.' The transaction had both a nontax economic effect and a nontax business motivation, satisfying both tests and requiring that it be given effect under any reading of the law.") Similarly, in **Compaq Computer Corp. v. Commissioner**, 277 F.3d 778 (5th Cir. 2001), the Fifth Circuit considered both the standard in **Rice's Toyota World** (that there be **no business purpose and no reasonable possibility of a profit)** [emphasis added] and the test in **ACM** (that these are mere factors in determining economic substance) and declined to accept one standard over the other.

---

**II. Subjective Intent – Business Purpose**

The subjective business purpose inquiry "examines whether the taxpayer was induced to commit capital for reasons relating only to tax considerations or whether a nontax motive, or legitimate profit motive, was involved." **Shriver v. Commissioner**, 899 F.2d 724, 726 (8th Cir. 1990)(citing **Rice's Toyota World, supra**). To determine that intent, the following credible evidence is considered: (i) whether a profit was possible; 11 (ii) whether the taxpayer had a nontax business purpose; 12 (iii) whether the taxpayer, or its advisors, considered or investigated the transaction, including market risk; 13 (iv) whether the entities involved in the transaction were entities separate and apart from the taxpayer doing legitimate business before and after the transaction; 14 (v) whether all the purported transactions were engaged in at arm's-length with the parties doing what the parties intended to do; 15 and (vi) whether the transaction was marketed as a tax shelter in which the purported tax benefit significantly exceeded the taxpayer's actual investment. 16

---

**Footnote 11: See Goldstein v. Commissioner**, 364, F.2d 734 (2d Cir. 1966); **Sacks v. Commissioner**, 69 F.3d 982 (9th Cir. 1995); **Winn-Dixie, Inc. v. Commissioner**, 113 T.C. 254 (1999) **aff'd in part Winn-Dixie Stores, Inc. v. Commissioner**, 254 F.3d 1313 (11th Cir. 2001), **cert. denied**, 535 U.S. 986 (2002).

**Footnote 12: See Rose v. Commissioner**, 868 F.2d 851 (6th Cir. 1989); **Casebeer v. Commissioner**, 909 F.2d 1360 (9th Cir 1990); **Newman v.**

**Commissioner**, 894 F.2d 560, 563 (2d Cir. 1990); **Winn-Dixie, Inc. v. Commissioner**, 113 T.C. 254 (1999) **aff'd in part Winn-Dixie Stores, Inc. v. Commissioner**, 254 F.3d 1313 (11th Cir. 2001); **Salina Partnership v. Commissioner**, T.C. Memo 2000-352 (2000).

**Footnote 13: See Rose v. Commissioner**, 868 F.2d 851 (6th Cir. 1989); **Kirchman v. Commissioner**, 862 F.2d 1486 (11th Cir. 1989); **Casebeer v. Commissioner**, 909 F.2d 1360 (9th Cir 1990); **Salina Partnership v. Commissioner**, T.C. Memo 2000-352 (2000); **Nicole Rose Corp. v. Commissioner**, 117 TC 328 (2001).

**Footnote 14: See IES Industries Inc. v. Commissioner**, 253 F.3d 350, 355 - 56 (8th Cir. 2001).

**Footnote 15: See Rose v. Commissioner**, 868 F.2d 851 (6th Cir. 1989); **Kirchman v. Commissioner**, 862 F.2d 1486 (11th Cir. 1989); **James v. Commissioner**, 899 F.2d 905 (10th Cir. 1990); **Pasternak v. Commissioner**, 990 F.2d 893 (6th Cir. 1993); **IES Industries Inc. v. Commissioner**, 253 F.3d 350, 356 (8th Cir. 2001).

**Footnote 16: See Pasternak v. Commissioner**, 990 F.2d 893 (6th Cir. 1993).

---

Taxpayers engaging in a DAD transaction will likely assert a profit objective as the nontax business purpose. The lack of economic substance argument applies where a transaction did not have a realistic pre-tax profit potential. Evidence should be sought to demonstrate that the taxpayer and the promoter primarily planned the transaction for tax purposes and that any potential for profit was incidental to that purpose.

Such evidence might include items such as the following: (i) promotional materials or other evidence that the DAD transactions were sold as tax shelters with limited consideration of the underlying economics of the transaction; (ii) evidence that the U.S. taxpayer, or the U.S. taxpayer's advisors, did not investigate the market risk prior to entering into the DAD transaction; (iii) evidence that the partnership undertook no or minimal activities designed to profit from the sale of and/or collection on the distressed assets, and evidence regarding the partnership's business plans and activities, or lack thereof, other than those relating to the distressed assets; and (iv) such information from the FP and third-party facilitators, **e.g.**, accountants, appraisers, etc., with respect to whether the entire series of steps, including the sale of the partnership interest by FP and the sale of the DAD shortly after its contribution, were preplanned.

A direct source of such evidence regarding the taxpayer's contention of a nontax business purpose is correspondence between the Promoter and the U.S. taxpayer, including, but not limited to, offering memos, letters identifying tax goals, emails and in-house communications at the offices of both the promoter and the accommodating parties. Written correspondence is the best evidence, but evidence of oral communications regarding tax goals is also useful. Indirect sources of the same include correlations between tax losses generated and tax losses requested, and between the U.S. taxpayer's income and the tax losses generated, particularly if it can be shown that the income to be sheltered was attributable to an unusual windfall, like the liquidation of stock options, or sale of a business.

**III. Objective Economic Substance**

Courts have used different measures to determine whether a transaction has objective economic substance. These measures include whether there is a potential for profit, and whether the transaction otherwise altered the economic relationships of the parties.

This determination is generally made by reference to whether there was a reasonable or

realistic possibility of profit. 17 **See e.g., Gilman v. Commissioner**, 933 F.2d 143, 146 (2d Cir. 1991)(determine economic substance based on "if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.") The amount of profit potential necessary to demonstrate objective economic substance may vary by jurisdiction. 18 However, a transaction is not required to result in a profit and similar transactions do not need to be profitable in order for the taxpayer's transaction to have economic substance. **See Cherin v. Commissioner**, 89 T.C. 986, 994 (1987). **See also Abramson v. Commissioner**, 86 T.C. 360 (1986)(holding that potential for profit is found when a transaction is carefully conceived and planned in accordance with standards applicable to a particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment).

**Footnote 17:** The appropriate inquiry is not whether the taxpayer made a profit but whether there was an objective reasonable possibility that the taxpayer could earn a pre-tax profit from the transaction.

**Footnote 18:** In assessing the role of profit in determining whether a transaction has economic substance, the Third Circuit has held, based on **Sheldon,** that "a prospect of a nominal, incidental pre-tax profit" would not support a finding that the transaction was designed to serve a nontax profit motive. **ACM Partnership, supra**. at 258 (citing **Sheldon v. Commissioner**, 94 T.C. 738, 768 (1990)). In making this determination, the court took into account transaction costs. Id. at 257. In this evaluation, some courts have considered a small chance of a large payoff to support a finding of economic substance. **See Jacobson v. Commissioner**, 915 F.2d 835 (2d Cir. 1990) (citing Treas. Reg. Section 1.183-2(a) (1990)).

The courts have indicated that a minimal profit should not be conclusive in finding economic substance or practical economic effects. Minimal or no profit has been held to be acceptable in highly risky circumstances, where a chance for large profits also existed. **See Bryant v. Commissioner**, 928 F.2d 745 (6th Cir. 1991); **Jacobson v. Commissioner**, 915 F.2d 832 (2 d Cir. 1990). Conversely, a minimal profit should be less acceptable when a ceiling on profits from a transaction is all but certain. **See ASA**, 201 F.3d 505. The fact that the taxpayer is willing to accept minimal returns in a transaction with little additional profit potential is evidence that the transaction was tax motivated. **See ACM Partnership**, 157 F.3d 231.

In developing this prong of the argument, it is not enough to show that the transaction was not profitable or was only nominally profitable. The facts must support a conclusion that the taxpayer could not reasonably expect to profit from the transaction or, at best, could realize only a nominal profit. All direct and indirect fees and costs paid by the taxpayer, any offsetting positions related to the overall transaction, any collars or other agreements limiting potential gains or losses, and any indemnity agreements between the accommodating parties and the promoter should be determined.

Certain courts have been willing to recognize the economic substance of a transaction when, in lieu of a reasonable possibility of profit, the taxpayer establishes that the transaction altered the economic relationships of the parties. **See Knetsch v. United States**, 364 U.S. 361 ( 1960). For example, courts have found that objective economic substance existed where the transaction created a genuine obligation enforceable by an unrelated party. **See United Parcel Services, supra**, at 1018; **Sacks, supra**, at 988-990 (the use of recourse debt created a genuine obligation for the taxpayer and this illustrated a genuine economic effect). However, it does not appear that this secondary standard has been universally accepted. See, for example, **Gilman v. Commissioner**, 933 F.2d 143, 147-48 (2d Cir. 1991) in which the court rejected the taxpayer's argument that the relevant standard for determining economic substance is whether the transaction may cause any change in the economic positions of the parties (other than tax savings) and that where a transaction changes the beneficial and economic rights of the parties it cannot be a sham. **See also Long Term Capital Holdings' v. United States**, 330 F. Supp.2d 122 (D. Conn. 2004), **quoting Gilman**

**v. Commissioner**.

In determining in which DAD cases an economic substance argument should be advanced, it would be helpful to show that the promoter controlled critical phases of the underlying transactions and that the U.S. taxpayer's economic position before and after the disposition of the distressed assets remained unchanged, except for the shift of the built-in loss to the U.S taxpayer. Direct sources of such evidence will come primarily from the transactional documents as well as correspondence from, and interviews with, all the parties.

If it is determined that the transaction as a whole lacks economic substance, the non-economic deduction claimed by the U.S. taxpayer should be disallowed.

**C. Substance Over Form Doctrine**

Transactions that literally comply with the language of the Code but produce results other than what the Code and regulations intend are not given effect. In **Gregory v. Helvering**, 293 U.S. 465, 470 (1935), the Supreme Court found that even though the transaction did comply with the Code, "the transaction upon its face lies outside the plain intent of the statute." Therefore, the Court found that to give the transaction effect would be to "exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." **Id.** In **Knetsch v. United States**, 364 U.S. 361 (1960), the Supreme Court once again found a transaction abusive, even though the transaction met every literal requirement of the Code. The Court stated that "there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction." **Id**. at 366.

A transaction that is entered into solely for the purpose of tax reduction and that has no economic or commercial objective to support the transaction is a sham and is without effect for federal income tax purposes. **Frank Lyon Co. v. United States**, 435 U.S. 561 (1978); **Rice's Toyota World, Inc. v. Commissioner**, 752 F.2d 89 (4th Cir. 1985); **Estate of Franklin v. Commissioner**, 64 T.C. 752 (1975); **Nicole Rose Corp. v. Commissioner**, 117 T.C. 328 (2001). When a transaction is treated as a sham, the form of the transaction is disregarded and the proper tax treatment of the transaction must be determined. Thus, if the DAD transaction is a sham transaction, the form of the transaction should be disregarded. More particularly, the partnership interest of FP should be disregarded and FP should be treated as having sold the distressed asset directly to the U.S. taxpayer or to the partnership for the fair market value of the asset. In disregarding the transaction, FP would recognize the economic loss inherent in the distressed asset and the U.S. taxpayer or the partnership would have a fair market value basis in such asset. Thus, the shift of the economic loss from FP to the U.S. taxpayer or to the partnership is avoided.

**ISSUE 5. Any loss purportedly realized in connection with the investments should be disallowed to the partners and to the partnership under Section 165(c)(2), because the primary purpose of the investment was tax avoidance.**

Section 165(a) allows as a deduction any loss sustained during the year and not compensated by insurance or otherwise. Losses claimed by individuals, other than casualty losses, are limited by Section 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. The term "for profit" is universally construed to mean "primarily for profit." **E.g. Helvering v. National Grocery Co**., 304 U.S. 282 (1938); **DeWees v. Commissioner**, 870 F.2d 21, 33 (1st Cir. 1989), **aff'g sub nom Glass v. Commissioner**, 87 T.C. 1087 (1987); **Simon v. Commissioner**, 830 F.2d 499 (3d Cir 1987), **aff'g** TC Memo 1986-156; **King v. U.S.**, 545 F.2d 700, 708 (10th Cir 1976); **Austin v. Commissioner**, 298 F.2d. 583(2d Cir. 1962), aff'g 35 T.C. 221 (1960); **Fox v. Commissioner**, 82 T.C. 1001, 1021 (1984). In this context, the term "primarily," means "principally" or of "first importance," **Jefferson v. Commissioner**, 50 TC 963, 968 (1968), quoting **Malat v. Riddell**, 383 U.S. 569 (1966), while "profit" means economic profit independent of tax savings. **Seaman v. Commissioner**, 84 T.C. 564, 588 (1985); **Surloff v. Commissioner**, 81 T.C. 210, 233 (1983); **Shapiro v. Commissioner**, 40 T. C. 34 (1963).

In determining whether a taxpayer possesses the requisite profit motive under Section 165(c),

the courts look to the individual taxpayer's subjective motivation for entering into the transaction. **Howell v. Commissioner**, 41 T.C. 13 (1963), **aff'd**, 332 F.2d 428 (3d Cir. 1964); **Golany v. Commissioner**, 72 T.C. 411, 425 (1979), **aff'd** 647 F.2d 170 (9th Cir. 1981); **Allen v. Commissioner**, 72 T.C. 28, 33 (1979); **Dunn v. Commissioner**, 70 T.C. 715, 720 (1978), **aff'd** 615 F.2d 578(2d Cir. 1980.

When partners invest through a partnership, the determination of primary motive, for purposes of Section 165(c)(2) and other provisions requiring a business or profit motive, is made at the partnership level. **See** Section 703(a) (partnership's taxable income computed in the same manner as an individual's); **Brannen v. Commissioner**, 78 T.C. 471, 505 (1982), **aff'd**, 722 F.2d 695 (11th Cir. 1984) ("In order for a partnership to be entitled to a deduction for expenses attributable to a trade or business in computing its taxable income (or loss) under Section 703(a), it must be established that the partnership engaged in the activity with the primary purpose and intent of making a profit."). In determining whether the partnership engaged in the activity for profit, all of the relevant facts and circumstances are taken into account, and the burden is on the taxpayer. **See Brannen**, 78 T.C. at 506. The intent of the partnership for purposes of applying Section 165(c)(2) is determined by reference to the collective intent of the general partners, managers, and other controlling individuals, including owners. **See Ewing v. Commissioner**, 91 T.C. 396, 416-17 (1988), **aff'd without published opinion**, 940 F.2d 1534 (9th Cir. 1981); **Rosenfeld v. Commissioner**, 82 T.C. 105, 112 ( 1984); **Seigel v. Commissioner**, 78 T.C. 659, 698 (1982); **Resnick v. Commissioner**, 66 T.C. 74 (1976), **aff'd per curiam**, 555 F.2d 634 (7th Cir. 1977).

The application of Section 165(c) does not require a finding that the transaction lacks economic substance. For example, the Tax Court in **Fox** found that because the taxpayer did not meet the requirements of Section 165(c)(2), it did not have to find that the transaction was a sham. **See also Smith v. Commissioner**, 78 T.C. 350 (1982), **aff'd without published opinion**, 820 F.2d 1220 (4th Cir. 1987), where the Tax Court found certain straddles not to be shams, but at the same time disallowed the resulting losses because the taxpayers lacked the requisite economic profit objective under Section 165(c)(2).

In **Ewing**, 91 TC at 418, the Tax Court derived the following guidelines from **Fox**:

1. The ultimate issue is profit motive and not profit potential. However, profit potential is a relevant factor to be considered in determining profit motive.
2. Profit motive refers to economic profit independent of tax savings.
3. It is the overall scheme which determines the deductibility or nondeductibility of the loss.
4. If there are two or more motives, it must be determined which is primary, or of first importance. The determination is essentially factual, and greater weight is to be given to objective facts than to self-serving statements characterizing intent.
5. Because the statute speaks of motive in "entering" a transaction, the main focus must be at the time the transactions were initiated. However, all circumstances surrounding the transactions are material to the question of intent.

Most taxpayers will claim that their primary reason for purchasing an interest in a DAD partnership was to profit from the sale of the distressed asset or the collection of the distressed debt. This claim is hard to credit in cases in which fees were based on a percentage of the desired tax loss and generally exceed the purchase price of the investment. In some cases, collars on the appreciation of the distressed asset limit the economic profit, even to an amount less than the sum of the promoter and legal fees. Moreover, the tax benefits greatly exceed any realistic economic benefit to be derived from the investment. Finally, in most cases, there is no evidence that any effort was made to collect on the distressed assets during the short period they were owned by the partnership or, for that matter, afterwards. Information regarding the partnership's decision to sell the distressed asset should be closely scrutinized. Sale of the distressed asset shortly after its contribution to the partnership by the FP and the FP's almost immediate sale of its partnership interest to the U.S. taxpayer at a price approximately equal to the asset's fair market value at the time of the contribution strongly indicate a lack of profit motive.

Any losses claimed with respect to the transactions described above should be disallowed under I.R.C. Section 165(c)(2) because the transactions were not entered into for profit.

**ISSUE 6. Legal and promoter fees and other "out-of-pocket expenses" paid by an individual U.S. taxpayer or a partnership with respect to a DAD transaction are generally not deductible.**

Generally, fees are not reported in a consistent manner by taxpayers who engage in DAD transactions. The various reporting positions for DAD transactions include the fees as part of partnership basis, deducted by the partnership as guaranteed payments, or deducted by the partner on Schedule A of the Form 1040. 19 Often, deductions for fees are buried on returns of affiliated pass-through entities such as S corporations or trusts, or are found on inappropriate line items on the return (such as negative income or cost of goods sold). It is not uncommon for the fees to be netted against other items, making the fees difficult to identify.

**Footnote 19:** Any determination of whether fees constitute a partnership item or an affected item should be coordinated with Counsel.

Although, depending on the context, the issue may arise under several different Code provisions, fees and other out-of-pocket expenses incurred in connection with a DAD transaction are generally not deductible by the taxpayer, S corporation or partnership. The expenses are disallowed commonly in the shelter context under Section 212(2), which requires a primary non-tax profit motive. **See Agro Science Co. v. Commissioner**, 934 F.2d 573, 576 (5th Cir. 1991), **cert. denied**, 502 U.S. 907 (1991); **Simon v. Commissioner**, 830 F.2d 499, 500-501 (3d Cir.1987). Similarly, the courts have repeatedly denied a deduction for a "theft loss" for cash out-of-pocket expenses that are paid to invest in shelter transactions. **See Viehweg v. Commissioner**, 90 T.C. 1248 (1988), **cert. denied**, 502 U.S. 819 (1991); **Marine v. Commissioner**, 92 T.C. 958 (1989), **aff'd** 921 F.2d 280 (9th Cir. 1991); Rev. Rul. 70-333, 1970-1 C.B. 38. 20 Depending on the context, other provisions, such as Sections 162 , 183, 195, 263, and 709, may come into play to disallow a deduction. **See, e.g., Surloff v. Commissioner**, 81 T.C. 210 (1983); **Flowers v. Comm'r**, 80 T.C. 914 (1983) ("Offeree representative" fees and costs of tax opinions prepared to promote sale of tax shelter not deductible under Section 162, 212 and 709).

**Footnote 20:** In **Nichols v. Comm'r**, 43 T.C. 842 (1965), **nonacq.**, 1970 1 C.B. xvii, the Tax Court held that a theft loss was allowable where the shelter promoter fraudulently failed to acquire bonds and perform other promised actions. **Nichols** is easily distinguishable from a DAD transaction, in which the shelter transactions are performed as promised and the only "loss" is the investor's failure to achieve the desired tax consequences.

While the promoter fees and legal fees paid to the law firms rendering the stock tax shelter opinions in a DAD case should be disallowed, certain fees may be deductible. These include legal fees paid to an attorney or accountant wholly independent from the promoter to analyze the transaction, fees paid to establish entities that are actually used in substantial business activities unrelated to the DAD transaction or reasonable fees to prepare tax returns reporting the transactions. In some circumstances, Section 183 may allow the deduction of losses and expenses, even without a profit motive, to the extent of the gross income, if any, from the transaction. Note that when fees incurred by, or passed through to, an individual investor are otherwise deductible, they are itemized deductions, subject to the limits provided by Sections 67 and 68.

**ISSUE 7. The Service should assert the appropriate component(s) of the Section 6662 accuracy-related penalties against a U.S. taxpayer who claimed losses from a DAD**

**transaction unless the taxpayer is able to establish reasonable cause and good faith under Section 6664(c)(1) and the applicable regulations.**

Section 6662 21 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment 22 attributable to, among other things: (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, and (3) any substantial valuation misstatement under chapter 1. Section 6662(b)(1), (2) & (3). Section 6662(h) provides a penalty of 40% of the underpayment attributable to a gross valuation misstatement where the basis of any property is overstated by 400% or more. Treas. Reg. Section 1.6662 2(c) provides that there is no stacking of the accuracy related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent (40 percent in the case of a gross valuation misstatement), even if that portion of the underpayment is attributable to more than one type of misconduct (e.g. negligence and substantial valuation misstatement). **See D.H.L. Corp. v. Commissioner**, T.C. Memo. 1998 461, **aff'd in part and rev'd on other grounds, remanded by**, 285 F.3d 1210 (9th Cir. 2002).

---

**Footnote 21:** Section 6662 was recently amended by both the American Jobs Creation Act of 2004, P.L. 108-357, 118 Stat. 1418 (2004), and the Pension Protection Act of 2006, P.L. 109-280, 120 Stat. 780 (2006). These amendments apply only to tax years ending after October 22, 2004 and returns filed after August 17, 2006 respectively. This CIP generally references Section 6662 in effect before these recent amendments.

**Footnote 22:** For purposes of Section 6662, the term "underpayment" is generally the amount by which the taxpayer's correct tax is greater than the tax reported on the return. **See** Section 6664(a).

---

**A. Negligence**

Section 6662(b)(1) applies where there is negligence or a disregard of the rules or regulations. Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. **See** Section 6662(c) and Treas. Reg. Section 1.6662-3(b). Negligence also includes a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation." **See Marcello v. Commissioner**, 380 F.2d 499, 506 (5th Cir. 1967), **aff'g** 43 T.C. 168 (1964); **Neely v. Commissioner**, 85 T.C. 934, 947 (1985). Treas. Reg. Section 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem "too good to be true" under the circumstances to a reasonable and prudent person.

The negligence penalty is appropriate where a taxpayer reports losses from a transaction which greatly exceeded his/her investment. The Third Circuit, in sustaining the accuracy-related penalty due to negligence explicitly warned "When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." **Neonatology Associates, P.A., et. al. v. Commissioner**, 299 F.3d 221 (3d Cir. 2002), **aff'g** 115 T.C. 43.

The term "disregard" includes any carelessness, reckless or intentional disregard of rules or regulations. A disregard is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to a rule or regulation. A disregard is reckless where the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which are a substantial deviation from the standard of conduct observed by a reasonable person. Additionally, a disregard is intentional where the taxpayer has knowledge of the rule or regulation that it disregards. Treas. Reg. Section 1.6662-3(b)(2).

"Rules or regulations" include the provisions of the Code, temporary or final Treasury regulations, and revenue rulings or notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin. Treas. Reg. Section 1.6662-3(b)(2). Therefore, if the facts indicate that a taxpayer took a return position contrary to any published notice or revenue ruling, the taxpayer may be subject to the accuracy related penalty for an underpayment attributable to disregard of rules and regulations, if the return position was taken subsequent to the issuance of the notice or revenue ruling.

The accuracy related penalty for disregard of rules and regulations will not be imposed on any portion of underpayment due to a position contrary to rules and regulations if: (1) the position is disclosed on a properly completed Form 8275 or Form 8275 R (the latter is used for a position contrary to regulations) and (2), in the case of a position contrary to a regulation, the position represents a good faith challenge to the validity of a regulation. Treas. Reg. Section 1.6662 3(c). This adequate disclosure exception applies only if the taxpayer has a reasonable basis for the position and keeps adequate records to substantiate items correctly. Treas. Reg. Section 1.6662 3(c)(1). Moreover, a taxpayer who takes a position contrary to a revenue ruling or a notice has not disregarded the ruling or notice if the contrary position has a realistic possibility of being sustained on its merits. Treas. Reg. Section 1.6662 3(b)(2).

The taxpayer has the burden of overcoming the presumption that the IRS' determination of negligence is correct. **Marcello v. Commissioner**, 380 F.2d 499 (5th Cir. 1967). With respect to examinations commencing after July 22, 1998, however, the Service must first meet the burden of production with respect to negligence. Section 7491(c); **Higbee v. Commissioner**, 116 T.C. 438, 446 (2002).

**B. Substantial Understatement**

Section 6662(a) and (b)(2) provides that a 20 percent accuracy-related penalty applies to any portion of an underpayment for which there is a substantial understatement of income tax. A substantial understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). Section 6662(d)(1). In most DAD cases, the understatement attributable to the disallowance of the losses claimed exceeds this threshold amount. Therefore, an accuracy-related penalty attributable to a substantial understatement may be applicable.

Specific rules apply to the calculation of the understatement when any portion of the understatement arises from an item attributable to a tax shelter. For purposes of Section 6662(d)(2)(C), a tax shelter is a partnership or other entity, an investment plan or arrangement, or other plan or arrangement where a significant purpose 23 of such partnership, entity, plan or arrangement is the avoidance or evasion of federal income tax. Section 6662(d)(2)(C)(iii). Because the purpose of a DAD transaction is tax avoidance, it is a tax shelter pursuant to Section 6662(d)(2)(C). Different rules apply however, depending upon whether the taxpayer is a corporation or an individual or entity other than a corporation.

**Footnote 23:** For any transactions entered into before August 5, 1997, the standard to be applied in determining whether a transaction was a tax shelter is "the principle purpose" rather than "a significant purpose."

In the case of any item of a non-corporate taxpayer which is attributable to a tax shelter, understatements are generally reduced by the portion of the understatement attributable to: ( 1) the tax treatment of items for which there was substantial authority for such treatment, and where (2) the taxpayer reasonably believed that the tax treatment of the item was more likely than not the proper treatment. Section 6662(d)(2)(C)(i). 24

**Footnote 24:** Note that the AJCA amendments to Section 6662, for tax years ending after October 22, 2004, eliminated the reduction of the understatement for all taxpayers if the item is attributable to a tax shelter.

Treas. Reg. Section 1.6662-4(d)(2) provides the substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. It is less stringent than the "more likely than not" standard (the standard that is met when there is a greater than 50 percent likelihood of the position being upheld), but more stringent than the "reasonable basis" standard required to avoid the negligence penalty under Treas. Reg. Section 1.6662-3(b)(3). There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists. Treas. Reg. Section 1.6662-4(d)(3)(i). On the basis of the substantive discussion of the DAD plan in the foregoing pages of this document, it is generally unlikely that a DAD transaction would meet the substantial authority test.

A taxpayer is considered to have reasonably believed that the tax treatment of an item is more likely than not the proper tax treatment if (1) the taxpayer analyzes the pertinent facts and authorities, and based on that analysis reasonably concludes, in good faith, that there is a greater than fifty-percent likelihood that the tax treatment of the item will be upheld if the Service challenges it, or (2) the taxpayer reasonably relies, in good faith, on the opinion of a professional tax advisor, which clearly states (based on the advisor's analysis of the pertinent facts and authorities) that the advisor concludes there is a greater than fifty percent likelihood the tax treatment of the item will be upheld if the Service challenges it. Treas. Reg. Section 1.6662-4(g)(4). Moreover, if the taxpayer is relying on tax advice to establish reasonable belief, the taxpayer must also meet the requirements generally applicable to relying on advice to establish good faith and reasonable cause. See Treas. Reg. Section 1.6662-4(g)(4)(ii). This is discussed further below under "D. Reasonable Cause and Good Faith."

If the item is attributable to a tax shelter and the taxpayer is a corporation, the understatement cannot be reduced. Section 6662(d)(2)(C)(ii). Therefore, if a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item (such as DAD), the accuracy-related penalty applies to the underpayment arising from the understatement unless the reasonable cause and good faith exception applies.

**C. Substantial Valuation Misstatement**

For the accuracy related penalty attributable to a substantial valuation misstatement to apply, the portion of the underpayment attributable to a substantial valuation misstatement must exceed $5,000 ($10,000 for a corporation, other than an S corporation or a personal holding company). Section 6662(e)(2).

A substantial valuation misstatement exists if the value or adjusted basis of any property claimed on a return is 200 percent or more of the amount determined to be the correct amount of such value or adjusted basis. Section 6662(e)(1)(A). If the value or adjusted basis of any property claimed on a return is 400 percent or more of the amount determined to be the correct amount of such value or adjusted basis, the valuation misstatement constitutes a "gross valuation misstatement." Section 6662(h)(2)(A). 25 If there is a gross valuation misstatement, then the 20 percent penalty under Section 6662(a) is increased to 40 percent. Section 6662(h)(1).

**Footnote 25:** For returns filed after August 17, 2006, the 2006 Pension Protection Act reduced the amounts required for substantial and gross

valuation misstatements from 200 and 400 percent to 150 and 200 percent, respectively.

With respect to a DAD transaction, the "property" claimed on the return for the purpose of Section 6662(e) is the distressed asset (this may be the original distressed asset contributed by FP or in an interest in a partnership which holds the original distressed asset). The disparity in the basis creates a valuation misstatement. In most, if not all, DAD cases, the adjusted basis claimed for the distressed asset or partnership interest is 400 percent or more of the correct amount. Thus, the basis overstatement is of such a magnitude that a gross valuation accuracy-related penalty will be appropriate. **See Santa Monica Pictures, LLC, et al v. Commissioner**, T.C. Memo. 2005-104, appeal docketed, No. 05-4491-ag (2d Cir. Aug. 16, 2005).

**D. Reasonable Cause and Good Faith**

Section 6664 provides an exception, applicable to all types of taxpayers, to the imposition of accuracy-related penalty if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. Section 6664(c). The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all relevant facts and circumstances. Treas. Reg. Section 1.6664-4(b)(1) and (f)(1). All relevant facts, including the nature of the tax investment, the complexity of the tax issues, issues of independence of a tax advisor, the competence of a tax advisor, the sophistication of the taxpayer, and the quality of an opinion, must be developed to determine whether the taxpayer was reasonable and acted in good faith.

Generally, the most important factor to determine reasonable cause and good faith is the extent to which the taxpayer exercised ordinary business care and prudence in attempting to assess his or her proper tax liability. See Treas. Reg. Section 1.6664-4(b)(1). See also **Larson v. Commissioner**, T.C. Memo. 2002-95; **Estate of Simplot v. Commissioner**, 112 T.C. 130, 183 (1999) (citing **Mandelbaum v. Commissioner**, T.C. Memo. 1995-255), **rev'd on other grounds**, 249 F.3d 1191 (9th Cir. 2001). Circumstances which may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including taxpayer's experience, knowledge, sophistication, and education. The taxpayer's mental and physical conditions, as well as sophistication with respect to the tax laws, at the time the return was filed, are relevant in deciding whether the taxpayer acted with reasonable cause. See **Kees v. Commissioner**, T.C. Memo. 1999-41. If the taxpayer is misguided, unsophisticated in tax law, and acts in good faith, a penalty is not warranted. **See Collins v. Commissioner**, 857 F.2d 1383, 1386 ( 9th Cir. 1988); **cf. Spears v. Commissioner**, T.C. Memo. 1996-341 (court was unconvinced by the claim of highly sophisticated, able, and successful investors that they acted reasonably in failing to inquire about their investment and simply relying on offering circulars and accountant, despite warnings in offering materials and explanations by accountant about limitations of accountant's investigation).

Reliance upon a tax opinion provided by a professional tax advisor may serve as a basis for the reasonable cause and good faith exception to the accuracy-related penalty. The reliance, however, must be objectively reasonable, as discussed more fully below. For example, the taxpayer must supply the professional with all the necessary information to assess the tax matter. The advice also must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances.

The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. Treas. Reg. Section 1.6662-4(c)(1)(ii).

Where a tax benefit depends on nontax factors, the taxpayer has a duty to investigate the underlying factors rather than simply relying on statements of another person, such as a promoter. **See Novinger v. Commissioner**, T.C. Memo. 1991-289. Further, if the tax advisor is not versed in these nontax matters, mere reliance on the tax advisor does not suffice. **See Addington v. United States**, 205 F.3d 54 (2d Cir. 2000); **Collins v. Commissioner**, 857 F.2d 1383 (9th Cir. 1988); **Freytag v. Commissioner**, 89 T.C. 849 ( 1987), **aff'd**, 904 F.2d 1011 (5th Cir. 1990).

Although a professional tax advisor's lack of independence is not alone a basis for rejecting a taxpayer's claim of reasonable cause and good faith, the fact that a taxpayer knew or should have known of the advisor's lack of independence is strong evidence that the taxpayer may not have relied in good faith upon the advisor's opinion. **Neonatology Assoc., P.A. v. Commissioner**, 115 T.C. 43, 98 (2001), **aff'd**, 299 F.3d 221 (3rd Cir. 2002)("Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about"); **Goldman v. Commissioner**, 39 F.3d 402, 408 (2nd Cir. 1994), **aff'g** T.C. Memo. 1993-480 ("Appellants cannot reasonably rely for professional advice on someone they know to be burdened with an inherent conflict of interest"); **Marine v. Commissioner**, 92 T.C. 958, 992-93 (1989), **aff'd without published opinion**, 921 F.2d 280 (9th Cir. 1991). Such reliance is especially unreasonable when the advice would seem to a reasonable person to be "too good to be true." **Pasternak v. Commissioner**, 990 F.2d 893, 903 (6th Cir. 1993), **aff'g Donahue v. Commissioner**, T.C. Memo. 1991-181; **Gale v. Commissioner**, T.C. Memo. 2002-54; **Elliot v. Commissioner**, 90 T.C. 960, 974 (1988), **aff'd without published opinion**, 899 F.2d 18 (9th Cir. 1990). **See** Treas. Reg. Section 1.6662-3(b)(2).

Similarly, the fact that a taxpayer consulted an independent tax advisor is not, standing alone, conclusive evidence of reasonable cause and good faith if additional facts suggest that the advice is not dependable. **Edwards v. Commissioner**, T.C. Memo. 2002-169; **Spears v. Commissioner**, T.C. Memo. 1996-341, **aff'd**. 98-1 USTC ¶ 50,108 (2d Cir. 1997). For example, a taxpayer may not rely on an independent tax adviser if the taxpayer knew or should have known that the tax adviser lacked sufficient expertise, the taxpayer did not provide the advisor with all necessary information, or the information the advisor was provided was not accurate. **Baldwin v. Commissioner**, T.C. Memo. 2002-162; **Spears v. Commissioner**, T.C. Memo. 1996-341, **aff'd** 98-1 USTC ¶ 50,108 (2d Cir. 1997).

**E. Penalties and Partnerships**

Special rules apply in transactions involving a partnership subject to the unified partnership audit and litigation procedures of Sections 6221 through 6234 (which may occur, for example, where the taxpayer forms a partnership that participates directly in the transaction). For taxable years ending after August 5, 1997, penalties are determined at the partnership level. Section 6221. Treas. Reg. Section 301.6221-1 26 provides as follows:

**Footnote 26:** Although the regulation is effective for years ending after October 3, 2001, it reflects Service litigating position for prior years.

(c) **Penalties determined at partnership level.** Any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be determined at the partnership level. Partner-level defenses to such items can only be asserted through refund actions following assessment and payment. Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations. Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty, addition to tax, or additional amount, other than partner-level defenses specified in Section 301.6221-1(d).

(d) **Partner-level defenses.** Partner-level defenses to any penalty, addition to tax, or

additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions following assessment and payment. Section 6230(c)(4). Partner-level defenses are limited to those that are personal to the partner or dependent upon the partner's separate return and cannot be determined at the partnership level. Examples of these determinations are whether any applicable threshold underpayment of tax has been met with respect to the partner or whether the partner has met the criteria of Section 6664(b)(penalties applicable only where return is filed), or Section 6664(c)(1)(reasonable cause exception) subject to partnership-level determinations as to the applicability of Section 6664(c)(2).

Following prior partnership law with respect to partnership items, relevant inquiries into tax motivation and negligence are made with respect to the general partner. **See Wolf v. Commissioner**, 4 F.3d 709, 713 (9th Cir. 1993)(focusing on the general partner's objective in determining profit motive); **Fox v. Commissioner**, 80 T.C. 972, 1008 (1983), aff'd 742 F.2d 1441 (2d Cir. 1984); **aff'd sub nom., Barnard v. Commissioner**, 731 F.2d 230 (4th Cir. 1984); **Zemel v. Commissioner**, 734 F.2d 5-9 (3d Cir. 1984). For instance, one considers whether the general partner acted with reasonable cause and good faith with respect to any portion of underpayment otherwise subject to accuracy-related penalty.

Partner-level defenses may only be raised through subsequent partner-level refund suits. **See** Treas. Reg. Sections 301.6221-1(d) and 301.6231(a)(6)-3. Good faith and reasonable cause of individual investors pursuant to Section 6664 would be the type of partner-level defense that can be raised in a subsequent partner-level refund suit. However, to the extent that the taxpayer effectively acted as the general partner and that the reasonable cause and good faith of the general partner are determined at the partnership level, it is likely that such partnership-level determinations will also dispose of such partner-level defenses. The same would be true for a partnership-level determination of whether the general partner reasonably believed that the tax treatment of an item was more likely than not the proper treatment under Section 6662(d)(2)(C)(i)(II).

Any questions on the application of the procedural provisions in this paper should be coordinated with Counsel.